Good morning, Your Honors. Counsel, may it please the Court, Terrence Franklin fled from the police by car and then by foot. He then broke into a home and hid in the basement. When five Minneapolis police officers found him there, he resisted their efforts to place him under arrest. He fought with them with their police dog. He punched one of the officers in the face and then he tackled another into an adjacent laundry room. He wrestled control of a submachine gun from that officer and pulled the trigger twice, shooting two of the officers. He was then shot and killed by defendant officers Michael Meath and Lucas Peterson. Now, these basic facts of what happened that I just recited, none of them were identified by the District Court as being in genuine dispute. But instead of granting the defendants qualified immunity, the District Court seized on two facts. Let me just stop you. The defendants, and you have named two, but you haven't, that's not all of them. The qualified immunity is personal and I couldn't find clarification in the briefs of who the qualified immunity appellants are. Thank you, Your Honor. I think I understand the issue. So the defendants are the City of Minneapolis, the former police chief, Janae Harteau, and then the individual defendant officers, Michael Meath and Lucas Peterson. There were four claims that were pled out in the complaints. One was intentional infliction. The city can't get qualified immunity. That's correct. And the chief, if she's a defendant, she wasn't personally involved, why wasn't, if she sued in her personal capacity, why wasn't she granted qualified immunity? I don't understand where the District Court sorted that out. Yeah, and it wasn't entirely clear to me either, Your Honor. There is no Monell claim. She sued in her individual capacity. I do not believe so. We're just talking about the two officers who fired the fatal, who used the deadly force. Yes, that's correct. Meath. Right. And I think technically the District Court should have dismissed the City of Minneapolis and Chief Harteau, but did not technically. So I think really what this... Just qualified immunity for because not clearly established doesn't end the official capacity claim. Well, the only claim against the actual city was... We're digressing because I want to talk about the qualified immunity appeal, but we have said time after time, it's personal to each defendant and it's only limited to damage claims. Yes, we understand that, Your Honor, and certainly weren't trying to assert it. But does Minnesota state law permit an interlocutory appeal of the denial of an official immunity defense? No, but when it's... Craighead denies the appeal, but doesn't address that point. Right. And I don't believe that it does, but here... Then that part of your appeal is gone. We believe that it is the facts underlying the official immunity and the vicarious official immunity claim are inextricably intertwined with the qualified immunity. So the court can exercise jurisdiction over the denial of that official immunity claim. You have to give me a case that allows a state law claim to be dragged along by a doctrine that's typically, do we get to the summary judgment merits of a federal claim? I believe... That's the inextricably precedence. Yeah. And I believe in the Parker v. Chard case, we had an official immunity claim that came along. And aside from that, I don't have the site on top of my head, but I believe we have cited some case law in the briefs that tie that official immunity. Yeah. So there were two facts seized on by the district court to deny qualified immunity. One was the precise timing between when Franklin shot the officers and when he was shot. That being up to 70 seconds, according to the district court. And the second fact was the presence or absence of blood on the submachine gun. And the district court basically seized on these two facts and said that they were material and allowed a denial of the qualified immunity claim. But there were basically two errors with this analysis. The first is that neither fact is material. And the second is that the 70 second timing is blatantly contradicted by the record. And the court should decline to accept that under Scott v. Harris. So I'll start with the immateriality of the precise timing. And these basic facts of what happened are listed in the district court's opinion. And the district court doesn't cite... Doesn't identify any of them as being in genuine dispute. On May 10th, 2013, Franklin was identified by a 911 caller. Let me ask you one... You say that in your brief. He doesn't identify them as being in genuine dispute. He also doesn't say that they're undisputed. So where does that leave us? Well, I think... Well, under the jurisdiction law, the court looks at what facts the district court assumed or likely assumed. And I think when you read the district court's opinion as a whole, the district court recites a litany of facts over five pages. And then it isolates just two and says these two facts are in genuine dispute. And so... And then he says that supports an inference that the officers were not threatened or didn't face a significant threat at the time they used the deadly force. Doesn't he say that essentially? The district court does say that, but ultimately... My concern with the case is whether we can review that or if that's a Johnson versus Jones type situation where the judge says, I think a jury could find that they weren't threatened at the time of the shooting. And you say, well, that's not a plausible inference, but can we review that in a qualified immunity appeal? I think the court absolutely can review that. And here's why. That fact is basically the ultimate legal standard of whether the shooting was constitutional. Whether the officers felt that Franklin continued to pose, or any suspect continued to pose a threat of serious harm or death. And if the district court can just say, I don't think the suspect posed a reasonable harm or a serious harm of bodily... Excuse me. I don't think the suspect posed a serious harm, if that's all it takes. And the issue is the Supreme Court under Moulinex and White v. Pauly and a series of other cases has said that the qualified immunity determination on appeal and at the district court needs to be done at a particularized basis. It can't be done on a general level. And so if the district court simply says, genuine issue as to whether there was a serious threat of harm or death, that prevents this court from reviewing, doing the review that the Supreme Court has mandated. And here what we have... I think the facts support an inference that he didn't have a gun and that he was alone in the laundry room. If the court did find those facts, then this court would then accept those facts and make the qualified immunity determination based on those specific facts. And so... Is that what he was saying? He said that there was no blood on the gun, didn't he mean that... I think... He was thinking that the evidence supported a finding that Franklin didn't have hold of the gun at the time of the shooting? I think the most critical part of the district court's analysis is on page 9 of its opinion. This is at the addendum at page 9. And the district court says, quote, according to the evidence presented by plaintiff, more than 70 seconds passed between the shots fired. And he goes on to say, further, plaintiff points to evidence suggesting the absence of blood on the MP5, which would have been either in Franklin's hand or close to him. And then the district court goes on to conclude, quote, this is at least circumstantial evidence that Franklin was not in possession of the MP5 when officers Peterson and Meath used deadly force against him. And so I think it's clear from this analysis that at best what the district court is saying is there's a genuine issue of fact as to whether Franklin was in possession of the submachine gun at the precise time he was shot. That's what it says, when officers Peterson and Meath used deadly force against him. But that's error. And if you look at the Lock v. Litchfield case, that addresses this very same issue. And this court addressed the plaintiff's argument that, well, the jury could conclude that the suspect wasn't in possession of the handgun at the time he was shot, therefore it was unconstitutional. And this court said, that's not the law. The law isn't, if they're not in possession of a firearm, you can't use deadly force. And that's exactly what the district court reduced this issue to, whether he was in possession of the gun at the precise moment he was shot. And consider defendant Meath, for example. Defendant Meath walks into the laundry room, is shot. He collapses to the floor, bleeding. He looks over and sees Franklin struggling with Peterson. He's able to draw his pistol and point it, and he waits for enough space to develop so he can safely shoot at Franklin. He does. Meath never saw the gun that shot him. In fact, he thought that, and this is at page A493 to 494, Meath thought that Franklin had his own gun. And that shooting was still reasonable because Meath had a reasonable belief that Franklin continued to pose a significant threat of bodily harm or death, and he had just been shot. And, by the way, Officer Durand, who was the one tackled, had just yelled, quote, he's got a gun. And so whether Franklin was in possession of a gun when Meath shot is actually immaterial under these circumstances. And the same basic analysis holds for Officer Peterson. He's punched in the face. Franklin and Durand go in the laundry room. Peterson eventually follows, sees Franklin struggling with Durand over the submachine gun, and then Peterson moves in to physically engage Franklin. He reaches out in the darkness so he can find where Franklin's head is, and eventually pulls the trigger. Whether Officer Durand, for example, successfully wrestled that gun away from Franklin in the moments before Peterson shot is immaterial because in order for the qualified immunity claim to be defeated, you need evidence to show that Peterson knew that that gun wasn't in Franklin's possession, and the district court didn't say there was a genuine dispute about any of that. And moreover, beyond just mere possession of the gun, we need Franklin to be subdued because we've got two officers who have been shot and are on the basement floor bleeding, potentially bleeding to death. We have an ongoing struggle between Franklin, who has fought with officers, already wrestled a machine gun from one of the officers and fired it. Even if the machine gun is taken away from Franklin, you need Franklin to be subdued. You need him no longer to pose a threat. And that just, there's... What about the time gap? What did you want to say about the time gap? Just on the time gap, two points. One, the precise timing between when Franklin shot and when he was shot is immaterial. Whether it's 20 seconds or 70 seconds, it is consistent with everything that... All of the physical evidence and everything the officers have said. And then the other issue is that time gap is blatantly contradicted by the record. The video that was made by a citizen across the street is in the record before the court. If one listens to that video, there is absolutely nothing in it that can be interpreted as gunshots. And moreover, the reaction... It's called a video, but it had an audio feature. Exactly. It was an audio-visual recording on an iPhone. What do we do with the expert at this point? I mean, there's been no ruling on Daubert, as I understand it. So... Yeah, that's correct. And that's because, Judge, the district court does not hear the Daubert motions until the motions in Lemony. So it's taking the expert as good for purposes of this motion, right? Right. But I think under Levy-Anderson, which is cited in our brief, it's clear that the expert opinion is not admissible at this stage. And the enhanced video, the expert opinion relied on, is not in the record. Even if it's not an expert opinion, how can this be as clear as Harris requires if different ears disagree over... If the critical issue on the video is whether you can hear a shot, because that establishes or doesn't establish a time gap, how can Harris apply if, let's say, 12 members of a jury split 7-5 over whether they can hear anything? Well, I don't think reasonable ears can differ over this video. And the only thing is... The fact that they enhanced isn't in the record. That's correct. And... How can we review this? How can we make a Harris determination? Well, the Harris determination is made on what's in the record, not what may or may not be. There's testimony in the record, though, don't we, that he thinks he can hear? Yes, Your Honor. I'm out of time. May I finish my answer to that? That is correct, but the expert opinion is basically not evidence. It is not admissible. And so we... Because under Levy-Anderson, an expert simply saying, I listened to this critically, it's in there. That's not helpful to the jury. That's not something that's admissible. And... My point is it doesn't matter whether he listened critically or uncritically. He's a person with an opinion that he can hear something. And Harris requires that it be blatantly, that the tangible evidence blatantly contradict all but one version of the facts. And the only response to that is that it basically, because it's inadmissible evidence, it amounts to nothing. And the plaintiff failed to put the enhanced video in the record, and quite frankly, if the enhanced video was in the record, we would be making the exact same argument about it. The only thing is this expert's opinion that he heard something, and it's just not admissible under Levy-Anderson. So there's nothing admissible in the record that should... . . . . It may not be admissible as an expert opinion, but is it inadmissible as ... I don't understand how it comes up at trial I guess, what witnesses would be allowed to testify I hear something? Well, I think witnesses who were on the scene, so the person who made the video would be able to testify, and his depth is . . . There was some neighbor or some indication of that. There's also neighbors who can testify about when gunshots occurred, and which by the way all of that first-hand personal knowledge-based testimony is inconsistent with the 72nd timing. I understand the situation. All right, thank you, Your Honor. May I proceed, Your Honors? Yes. Your Honors, thank you for hearing me on this matter. This is a case, I think, when you look at it in the final analysis, of an unarmed black man who had surrendered, who was killed by the police. There's evidence to support that contention, and I believe that Judge Frank's decision . . . Your brief prompts me to ask you, what does Mendez do to your analysis of the situation? In terms of . . . I think it takes away all of your introductions. You mean, Your Honor, as to whether it's appropriate for this court to consider this interlocutory appeal legally? No, no, no. Mendez is the case that says the only thing you look at from the application of deadly force is what was the situation facing the officers at the moment they applied the force. Oh, I understand that, Your Honor, but I . . . But your whole argument is, well, they were just looking to get this guy because he had run down an officer on the streets before, and therefore, they illegally entered the home and the basements. That's all irrelevant under Mendez, isn't it? Well, potentially, Your Honor, but I think that there are . . . Potentially. We're talking about an interlocutory appeal right now. I understand that, Your Honor, but there are factual issues. For example, the city . . . the defendants in this case are claiming that this young man grabbed the MP5 and intentionally shot it and hit two officers. That's something that's significantly in dispute. So, I think, you know, from my . . . By what . . . okay, but what . . . other than saying a jury might disbelieve them, what's the non-moving party's affirmative contradictory evidence for purposes of qualified immunity analysis? Well, for example, the contention that the young man's DNA is on the gun, Your Honor, that if his DNA is on the gun . . . That has nothing to do with whether he grabbed the gun. No, I understand that, but there's . . . just because the officers say it happened doesn't mean it happened. I mean, you know . . . We try to apply the Supreme Court's qualified immunity jurisprudence. I understand. If the only people on the scene are police officers who consistently testify to what Well . . . And the fact that . . . and the Supreme Court has said the fact that a jury might disbelieve the officers can't defeat qualified immunity. But it seems . . . Right? And that's what we have . . . that's what we deal with. I understand, Your Honor, but I think you have to look at the overall picture. I mean, for example . . . But then Mendez says, no, you don't look. If the claim . . . if the Fourth Amendment claim is excessive for deadly force, the only thing you look at is what was . . . what was objectively reasonable to the police officers at the moment they applied the force. Understood, but it would seem to me that Judge Frank looked at that, Your Honor, and he denied the motion. So, I think that we're dealing with an issue here of whether Judge Frank correctly rendered a decision based on the facts that were presented to him. And I would respectfully suggest . . . Maybe they know more review. No, you're right, Judge. No, I get that. No, I know. But, you know, accepting the facts that he accepted, but that's not very clear from the way he wrote it, except as counsel points out, the two facts that he thought were materially in dispute . . . I know, Judge, but the time gap issue alone calls into question the officer's version of how this event occurred. Why? Because Peterson testified, Your Honor, that . . . I mean, it seems to me it's part and parcel of the fact that if Peterson grabbed an MP5 and shot two officers, he would have been immediately dispatched. Within seconds, in fact, that's what Peterson testified to. Most of the officers wouldn't commit to any testimony specifically on the gap, but he said that he was dispatched immediately, which, of course, makes sense because they had side arms, Your Honor, and how long does it take to grab your side arm and shoot the guy? And the reality here is that that recording that was made by the citizen creates significant factual issues. We're talking about a gap of over 70 seconds. And it's not just the time gap, Your Honor. And, by the way, there is evidence that shots can be heard, the shots that dispatched Franklin can be heard at second 53 of the Gaines video. And it's not just the timing, Your Honor, it's also what can be heard. I mean, for example, the officers claim that this young man never uttered a word, but at second 8 in the video, and this would be, there was a 30-second gap before you can hear officers shot at second 11, you hear, my name is Mookie. That was the young man's name, and then you have let me go at second 27. That's a significant discrepancy from the version the officers gave. I think it's clear in the evidence in this case that the discharge of that MP5 was accidental discharge. So there are numerous factual discrepancies, starting with the attempted apprehension of South Minneapolis, which I detail in my brief. I mean . . . What is the evidence of accidental discharge? Is there anything specific? Well, yes, specifically, Your Honor, there was a witness by the name of Dave Scheibel. He's known as DOC Dave. He's not a member of the Minneapolis Police Department. He's someone employed by the DOC who apprehends fugitives, although this was not a fugitive case. DOC is what? The Department of Corrections, Your Honor, yes. He worked for the Minnesota DOC. And this is very important, and I detail this in my brief, and this concerns the issue of how it was that Franklin's DNA ended up on the MP5. It was because Scheibel put his hands on the young man to check for life and then was handed the MP5 by Officer Durant. So it's pretty clear that's how it ended up on the gun, and he claims he was wearing gloves, but the problem with that contention, nobody corroborates the fact that he had gloves. He never maintained the gloves. He said he discarded them, and Scheibel's DNA is on the gun also. So that's why Franklin's DNA is on the gun. That's certainly reasonable to understand that. But what's important here, Your Honors... What does that have to do with the accidental discharge? I'm going to get to that. When Durant handed them the gun, he said to Scheibel, and I quote, this was the gun that caused the injuries. I would submit to you that if this was the gun that a suspect had grabbed and shot two of the officers, he would have said something different, like, well, this is the gun, you know. So the quote was, this was the gun that caused the injuries. What injuries? Other injuries would he have been referring to? Well, yeah, caused the injuries, the two officers that were accidentally shot, correct. Yeah. But to me, that's the type of statement that I don't think is the type of statement you say if you have a suspect who grabbed a gun and shot two of your guys. So I think the inferences from that statement are significant. This sounds like common aftermath lawyer reasoning. Well, Judge, I mean, there's all kinds of factual disputes in this case, and they're detailed. But you just named one that I don't think is a dispute. It doesn't create a dispute. Well, what about the fact that when they attempted to apprehend him in the beginning, they claimed that one of the officers claimed that he attempted to run her over. That's not true. And I think that's significant because... How many hours before? That was at the start of the flight, right? No, that's true, Your Honor, yes. That was right in the beginning, sure. Oh, all right. So Mendez takes that out of the question. No, I understand. Yeah, no, I understand. Well, so I'm still looking for... Judge Colleton says, you know, where's the dispute? Where's the accidental discharge dispute? Where's anything other than disbelieving the cops that suggests that it was an accidental discharge? Your Honor, if he had intentionally grabbed that gun and shot two officers, I submit to you he would have been immediately killed. The Gaines video creates a... But he was wrestling at the time of the shot. Well, that's what the officers claim. That's what the officers claim. Judge, I admit to you there's no witnesses in the basement. There are no witnesses. So we have to go by the police version. But if the police version is to be believed, why does that video taken by the citizen create a significant time gap from the time of the discharge, of the time that an officer was shot up until the time that the young man was dispatched? I mean, I think that creates factual issues appropriate for a jury. Who makes it 70 seconds other than Primo? Well, Judge, at 2nd 11 of the Gaines video, you hear an officer by the name of Wyatt, he's an MTC officer, say officer shot. His deposition was taken and at the time he says officer shot, he's running back to the front of the home. So we had to fill in the time gap because the videotaping that was done by the citizen was not perpetual. So there was something that happened before the videotaping began. And when you take his testimony from his deposition from the time he was in the front of the house and he heard that something had happened, he ran to the back and he stopped to see what was going on and he was told to secure first aid equipment. The time there, Your Honor, is 30 seconds. When you add it together, it's 30 seconds. So at 2nd 53, when the shots are heard that result in Franklin's death, you deduct 53 minus 11 is 42, and you add 30 seconds from the time that he was first aware that a shot had happened. He heard that from his shoulder, Mike. So the point is when he says officer shot, that's not the exact time that he became aware that an officer had been shot. That was the time that he articulated officer shot and was picked up by the citizen's recording. So I think 72 seconds is a reasonable time gap. So your theory is because there was a time gap, fill it in for me. Well, because there was a time gap, their scenarios to how it happened I think is absurd. It's just not credible. I think the fact that they had the perception that this young man had tried to run over an officer, which was not true, I think that added to their anger and what was involved and it's an important predicate to what happened. You say that Peterson testified that Franklin grabbed the gun, caused the shots that injured the officers, and then was shot immediately? I believe it was Peterson, yes. Peterson's testimony, I believe he was the only officer of the five SWAT officers that were down there that gave an estimate as to the time gap. For example, Meath, I asked a fighter from time, can you give me an estimate as to the time gap between the time you were shot and the time that Franklin was killed, and he couldn't give me any response. However, Peterson was very specific. He said it was seconds. He said it was seconds, which of course it makes sense because if a suspect has intentionally shot two officers with their gun, then it's certainly reasonable that he would be killed immediately. You say that if the 70 seconds is reasonable inference, that that creates a dispute about? Their version of how the events unfolded, yes. Yes. Your Honors, I have nothing else to add unless there are any additional questions. I'll be happy to answer them. Did you look into this interlocutory appeal on official immunity? You know, Judge, I have to admit to you I did not research that issue. I think it's a reasonable point to bring up, and I apologize, but I cannot give an intelligent— I'm surprised to learn because I didn't research it that Minnesota doesn't allow the interlocutory appeal because its official immunity is sort of hand-in-glove with federal qualified immunity. I agree. And then the wrongful death claim, of course, we pursue that under Minnesota law, of course. But no, Your Honor, I have to admit to you I did not specifically research that issue. Well, I guess we have to—depending on where we are on the qualified immunity, we have to sort that one out separately. Fair enough. Thank you, Your Honor. Thank you. Mr. Carter, do you have any time? No, Your Honor. I'll give you two minutes. It's a factually complex appeal, at least seems like it. Thank you for the additional time, Your Honor. For the official immunity, one of the cases we cite in the brief is Eagle v. Morgan, 88F3D at 620. And then I believe the Parker v. Chard case also has that. And I have not looked into specifically whether Minnesota law allows an interlocutory appeal. In my experience, we've always tied these in as being inextricably. I understand that. I think probably the district judges typically do as well. But we'll look into that. Okay. Thank you, Your Honor. Peterson's testimony, at one point he does say matter of seconds on some timing issue. But there is a couple of things that the court should note about Peterson's testimony. At another point in time, Peterson says something to the effect of it seemed like 20 minutes. Moreover, Peterson didn't even hear the gunshots, the first volley of gunshots that Franklin fired. So that kind of illustrates the whole fog of war mentality that affects a witness under such traumatic and chaotic circumstances. So that isn't a contradiction that's sufficient to deny qualified immunity. This case is very different, as we argue in the brief, in the reply. It's very different from the Williams v. Hawley case. The district court at page 9 of its opinion footnote 1 specifically rejected the notion that Franklin's voice was on the video. And then finally, the accidental discharge, we don't think there's any evidence that suggests it was accidental. Moreover, it's immaterial because after two officers were shot, Officer Durand yelled, he's got a gun. And so regardless of how that submachine gun went off, it is immaterial. And I am out of time, and I wonder if the court would let me make one final comment on the jurisdictional issue. So it is clear that the district court made the ultimate finding that the shooting was unreasonable because Franklin didn't pose a threat, or the officers didn't reasonably believe that he posed a threat of serious harm or death. But to get to that finding, the district court had to assume facts. And under Johnson v. Jones, this court is allowed to look at the district court's opinion and try to figure out what those facts were. And moreover- How does that help you? I mean, if he made that inference, then he must have assumed facts that are different from the ones that you're laying out, because the ones you're laying out wouldn't support the conclusion. So I don't understand how that helps you. Well, I think it's clear from the district court's opinion that he didn't assume anything more than what I'm laying out. And the second point- You don't think he assumed that some of what you laid out was potentially not credible? And isn't that- If that's the route the district court's opinion went, then we're in a Williams v. Holley situation, and there the court exercised jurisdiction over that determination in an interlocutory appeal. And under that case, you had a ton of expert evidence, gunshot wound pathways, and testimony from a medical examiner about those being inconsistent with what the officer had said. The absence of gunpowder stippling and evidence about why that was inconsistent with what the officer said. Here, we don't have any of that. And that's not because the parties didn't develop that expert testimony. All of that was developed thoroughly with depositions of the medical examiner and forensic firearms examiners. And the plaintiff points to nothing in that, and the district court pointed to nothing in that that contradicts what the officer said. And with that, I thank your honors for the additional time. Thank you, counsel. The case has been thoroughly and well briefed and argued. Important issues will take it under advisement.